IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

MARK R. JOHNSON,                    )
                                   )
          Plaintiff,               )   Case No. CV06-372-HU
                                   )
     vs.                           )   FINDINGS AND
                                   )   RECOMMENDATION
JO ANNE B. BARNHART,               )
Commissioner, Social Security      )
Administration,                    )
                                   )
          Defendant.               )
_____)

Phyllis Burke
4370 N.E. Halsey Street
Portland, Oregon 97213
     Attorney for plaintiff

Karin J. Immergut
United States Attorney
District of Oregon
Neil J. Evans
Assistant United States Attorney
1000 S.W. Third Avenue, Suite 600
Portland, Oregon 97204

1   - FINDINGS AND RECOMMENDATION

Joanne E. Dantonio
Special Assistant United States Attorney
Social Security Administration
701 Fifth Avenue, Suite 2900 M/S 901
Seattle, Washington 98104
     Attorneys for defendant

HUBEL, Magistrate Judge:

Mark Johnson brought this action pursuant to Section 205(g) of the Social Security Act (the Act), 42 U.S.C. § 405(g), to obtain judicial review of a final decision of the Commissioner of the Social Security Administration (Commissioner) denying his application for disability insurance and Supplemental Security Income (SSI) benefits.

**Procedural Background**

Mr. Johnson filed protectively for benefits on December 18, 2000, alleging disability since December 1, 1997, based on musculoskeletal impairments, headaches, and problems with his memory. The applications were denied initially and on reconsideration. A hearing was held on July 15, 2002, before Administrative Law Judge (ALJ) Riley J. Atkins. On September 26, 2002, ALJ Atkins issued a decision finding Mr. Johnson not disabled. On October 5, 2003, the Appeals Council granted Mr. Johnson's request for review, vacating the ALJ's decision and remanding the case for further administrative proceedings. On August 4, 2004, and October 20, 2004, ALJ Atkins held additional hearings, and on March 29, 2005, the ALJ issued a decision again

finding Mr. Johnson not disabled because he had the residual functional capacity (RFC) to perform a limited range of light work. The Appeals Council denied Mr. Johnson's request for review, making the ALJ's March 2005 decision the final decision of the Commissioner.

### Factual Background

Born in November 1956, Mr. Johnson was 48 years old at the time of the ALJ's decision. He has a high school diploma. His past relevant work is as a bus mechanic in the distant past (1978 to 1987). Tr. 82. Mr. Johnson subsequently worked sporadically in various jobs through a temporary agency, but earnings from that work fell below substantial gainful activity levels. From Mr. Johnson's alleged onset date, December 1, 1997, through 1999, he worked on a limited basis in a bindery.

### Medical Evidence

Because the administrative record is quite voluminous (1461 pages), and because Mr. Johnson has challenged the ALJ's findings and conclusions only with respect to his alleged headaches, upper extremity and back impairments, and mental impairments, the discussion of the medical evidence will be limited to those impairments.

1.    <u>Headaches</u>

Mr. Johnson has reported headaches for many years. In February 1993, he was seen at a VA clinic for headaches on the

left side of his head, which he reported having had on a daily
basis for the previous three months. Tr. 316-17. A CT scan was
ordered to rule out a central nervous system tumor. Tr. 317. He
was prescribed Verapamil, on the assumption that the headaches
were either cluster headaches or migraines. Tr. 316. In April
1993, he was started on Indocin, after he reported that the
Verapamil caused nausea and feelings of malaise. Tr. 315. On
September 9, 1993, Mr. Johnson reported the headaches somewhat
improved, but still occurring at a rate of three or four per
week. Tr. 313.

In January 1994, Mr. Johnson reported that the headaches
were occurring less frequently, once or twice a week, and that
they were relieved with Indocin within 20 to 30 minutes. Tr. 307.

In April 1994, Mr. Johnson was admitted to a residential
treatment program for a 23-year history of alcohol and crack
cocaine abuse. Tr. 303-04, 225. At that time, it was thought that
his headaches were probably secondary to dehydration. Id. He was
discharged from the residential program to an outpatient program
on May 16, 1994. A physical examination conducted at discharge by
Patty Gardner, M.D., noted no health problems except seasonal
allergies and a possible systemic infection, for which he was
started on a course of Doxycycline. Tr. 226.

According to a a chart note dated March 4, 1999 and written
by Kasum Kumar, M.D., Mr. Johnson was "lost to follow up" after

4    - FINDINGS AND RECOMMENDATION

1994, except for a 1996 emergency room visit. Tr. 248. In April 1996, progress notes from a VA hospital emergency admission indicate that Mr. Johnson was again complaining of headaches every day for the preceding two weeks, with partial relief from Motrin and Excedrin. Tr. 285, 333, 334.

On February 16, 1999, Mr. Johnson presented at the VA hospital with cocaine, alcohol and nicotine dependence and headache. Tr. 219. He was admitted for six weeks of intensive substance abuse treatment, and discharged on April 14, 1999. Id. A discharge summary notes that Mr. Johnson began to experience headaches "which had plagued him in the past" during the hospital stay. Id. It was noted that Mr. Johnson was known to the hospital's headache clinic, and that his headaches had been variously assessed. Tr. 220. According to the discharge summary, Mr. Johnson was eventually diagnosed with cluster headaches, which responded "almost immediately" to use of Verapamil, supplemented by Tylenol.

During Mr. Johnson's hospital stay, it was surmised that the headaches were secondary to abstinence from cocaine. For example, on February 27, 1999, Pat Fitzgerald, a nurse practitioner, wrote:

> The patient is having sharp pain left temple with light sensitivity at time of headache pain. ... He is having some headache pain at least daily since entering ... on 2/16. The headache responds to Imitrex but has not had a 24 hour period pain free.

> I believe part of his sensitivity to what is going on relates to his being newly clean and sober--there is nothing to cover up the fact that his head hurts (absent cocaine and alcohol). ... Resting in a darkened room and using Imitrex helps eliminate the symptoms for several hours but, to this point, not 24 or more consecutive hours.

Tr. 253. See also tr. 250-51 (chart notes written by Pat Fitzgerald dated March 1999, suggesting possibility that headaches are secondary to absence of cocaine use because they were limited in duration when Mr. Johnson was using, and recording that Dr. Kumar agrees with this hypothesis). Mr. Johnson's headache complaints were nearly continuous during his hospital stay. See, e.g., tr. 220, 237, 239, 247.

On March 4, 1999, Dr. Kumar wrote that a head CT done at that time was normal. Tr. 248. Dr. Kumar noted that Mr. Johnson's headache had "some features of migraine and cluster, or it could be hemicrania continua, which has not yet responded to indomethacin." Tr. 248. Dr. Kumar recommended Verapamil, preceded by oxygen for 20 minutes. Id. If that treatment failed to work, Dr. Kumar recommended sumatriptan injections, along with indomethacin. Id. On March 10, 1999, a progress note stated that Mr. Johnson acknowledged partial relief of symptoms with use of oxygen, and indicated that the more probable diagnosis was cluster headaches. Tr. 244.

On May 21, 2001, Mr. Johnson was given a general physical examination by Lori Siegal, M.D. Tr. 1201. Mr. Johnson stated

6   - FINDINGS AND RECOMMENDATION

that while being treated for cocaine and alcohol dependence in 1999, he was diagnosed with cluster headaches. Tr. 1201-02. He reported that they responded well to oral Verapamil taken on a daily basis, with Tylenol as needed. Tr. 1202. According to Mr. Johnson, he was no longer on Verapamil and "rarely gets headaches." Id. Mr. Johnson reported that the headaches "may come in clusters for two to three weeks, and then may go away for as long as a year or two." Id.

Nevertheless, medical records indicate that Mr. Johnson sought treatment for headaches after May 2001. See, e.g., tr. 803-805, 807-808 (chart notes dated August 2001, complaint of daily headaches for two weeks and statement that he "had not had constant headache like this for about two or three years"); tr. 817-18 (chart note dated December 13, 2001, noting "migraines back again," and showing treatment with Verapamil and oxycodone); 757 (June 19, 2002 report from Mr. Johnson of two recent migraines that "were mild and resolved quickly"); 927-28 (chart notes dated December 2002, stating that Mr. Johnson being treated in the Headache Clinic for chronic headaches, occurring two to three times a week, lasting from a few hours to "sometimes all day;" treatment with Verapamil and Vicodin). A chart note dated December 2002, recorded by Robin Rinehart, M.D., states:

> The patient ... presents with a history of headaches
> ... . He reports that he has been seen in the
> Headache Clinic in the past, and was started in the

past with Verapamil for his headaches. He reports he gets headaches two to three times a week. Sometimes he wakes up with the headaches. They last anywhere from a few hours to sometimes all day. He reports the headaches start in the left front side of his head around the eye, and then he has a sharp pain through the left orbit. He sometimes has ... eye tearing. ... He reports he knows it is going to start because he starts to feel throbbing or his eyes hurt. They can be 10/10 as far as pain severity. He denies any visual problems with his headaches. No nausea or vomiting, no jaw clicking or popping. He knows no stressors which bring it on. He reports his smoking does not seem to affect it. He reports lying down in a dark room without any noise generally helps. Noise and light and any movement seem to make it worse. He reports that Imitrex has been tried in the past; however, that did not seem to help. ... He reports his Verapamil used to help, but does not seem to help much more. He will take aspirin and Excedrin which take the edge off. Vicodin and oxycodone seem to work the best.

Tr. 927-28. Dr. Rinehart's opinion was that Mr. Johnson's headaches did not "quite fit the category of cluster," and that they seemed to be more consistent with migraine headaches. Tr. 929. She increased the Verapamil dosage and started Mr. Johnson on rizatriptan, as well as occasional Vicodin. Id.

Chart notes dated April 28, 2003, show that Mr. Johnson had been seen in the Headache Clinic in December 2002 and February 2003, where he was initially treated with Verapamil and, when that proved ineffective, with atenolol and rizatriptan. The examiner, Joshua Studer, M.D., noted,

Since starting atenolol, the patient's headache frequency is the same at 2-3 times per week. He thinks the severity may be improved somewhat, but the [headaches] are still 7-10/10. Abortive therapy with

> rizatriptan is still effective. The [patient] knows
> no triggers... The [headaches] always start above his
> left eye, usually staying in that spot but
> occasionally extending to the back of the head.
> Photophobia and noise/movement sensitivity are the
> prominent features ... He has not had alcohol or
> cocaine for about two years. He takes amitryptilene
> 2-3 times per week ... for insomnia and hasn't noted
> an effect on his [headaches]. Narcotics do not help
> his migraines.

Tr. 925. Dr. Studer thought Mr. Johnson should start
amitryptilene for migraine prophylaxis, or, alternatively,
depakote. He noted, "The patient has no need for the atenolol
from a migraine prophylaxis perspective, although it appears to
have good effect on his [blood pressure] in this [patient] that
appears to have stroke/lipid concerns." Tr. 926. Dr. Studer
recommended that Mr. Johnson continue with rizatriptan. Id.

        Chart notes from the Headache Clinic, dated March 2, 2004,
state that Mr. Johnson reports four to five headaches per month
which he rates at 8/10 in intensity, but lasting only 30-45
minutes after taking Zomig. Mr. Johnson thought his headaches
were "less often and not as severe." Tr. 1239. A chart note dated
May 11, 2004 states that Mr. Johnson reported his headaches
improved with atenolol and nortriptyline. Tr. 1225.

    On May 18, 2004, Mr. Johnson told Tatsuro Ogisu, M.D., an
examining orthopedist, that his headaches occurred perhaps once
or twice per week, with associated photophobia and phonophobia
and some blurring of vision. Tr. 937. Mr. Johnson said he was

9   - FINDINGS AND RECOMMENDATION

able to retain relief 30-45 minutes after taking Zomig. Tr. 938.

2.    Upper extremity and back impairments

On May 10, 2001, Mr. Johnson was examined by Wayne Kelley, a physician's assistant. Tr. 1195. In a report approved by Paul Matson, M.D. on May 21, 2001, Mr. Kelley noted that on examination, there was tenderness along the lumbar spine to percussion and palpation, but that Mr. Johnson could stand on his heels and toes. Tr. 1196. He had 50 degrees of forward flexion, 5 degrees of hyperextension, lateral bending 15 degrees in both directions, and rotation 20 degrees in both directions. Deep tendon reflexes were hypoactive at the knees and normal at the ankles. Straight leg raises were negative. There was no measurable atrophy. Sensation was normal throughout.

Examination of the left hand showed that Mr. Johnson could approximate his thumb to within four centimeters of the median crease and the remaining digits to one centimeter of the median crease. Id. He had a grip of 3/5 on the left and 5/5 on the right. Sensation was intact in the left hand. Id.

On July 9, 2003, Mr. Johnson was again examined by Mr. Kelley. Tr. 1191. In a report approved by Dr. Matson on August 11, 2003, Mr. Kelley observed that with his left hand, Mr. Johnson was now able to approximate his thumb to within two centimeters of the median crease. Tr. 1192. Grip was improved to 5/5.

Examination of the left shoulder showed mild trapezial tenderness, some AC tenderness and mild anterior shoulder joint tenderness, but no atrophy. Id. Slight popping was noted on range of motion, which was from 0-160 of forward flexion and abduction, and 70 degrees internal and external rotation. Id. The AC joint appeared normal, and the clavicle was intact. Id.

Examination of the right elbow showed tenderness over the medial epicondyle. Range of motion was 0-140 degrees of flexion; 80 and 85 degrees of pronation and supination.

There was tenderness over the lower lumbar spine. Mr. Johnson had 75 degrees of forward flexion, 5 degrees of hyperextension, lateral bending of 20 degrees in both directions and rotation 20 degrees in both directions. Deep tendon reflexes were equal at the knees and ankles. Sensation was intact throughout.

The diagnoses were degenerative joint disease of both knees, left greater than right; chronic lumbosacral strain superimposed on mild degenerative disease; medial epicondylitis, right elbow; chronic trapezial strain, left shoulder; and fracture of left thumb. Tr. 1193.

On July 10, 2003, Mr. Johnson was seen by Joshua Johnson, M.D., to evaluate his claims of disability based on his right and left knee, right elbow, lower back, left shoulder, left thumb, migraines, and depression. Tr. 1186. Dr. Johnson's report was

11 - FINDINGS AND RECOMMENDATION

also approved by Dr. Matson, on August 11, 2003. Id.

Motor examination showed full strength throughout except for the left thumb, which showed 4/5 strength in all muscle groups. Coordination examination was also normal. Sensory examination was grossly normal to light touch and pin prick. Id.

Examination of the left shoulder showed pain with adduction to 20 degrees above horizontal, with passive range of motion, but otherwise full. There was moderate pain to palpation of the anterior shoulder and the left trapezius, but there appeared to be no changes in muscle bulk or tone. Id.

Range of motion of the right elbow was full, without crepitus, but with pain elicited at approximately 150 degrees of extension. Elbow anatomy appeared on examination and palpation to be normal. Id.

Mr. Johnson's lumbar spine showed approximately 15 degrees range of motion with extension, approximately 85 degrees with flexion, and normal lateral rotation bilaterally. Id.

A review of x-rays taken in 2003 showed that the left shoulder was normal. X-rays of the lumbar spine from April 2003 indicated mild degenerative joint disease. Id. An x-ray of the left hand from September 2002 showed trauma to the first metacarpal.

On May 18, 2004, Mr. Johnson was given a comprehensive orthopedic examination for evaluation of left knee pain, back

problems, and hand problems by Tatsuro Ogisu, M.D. Tr. 936.

Mr. Johnson reported that he had fractured his left thumb in the 1980s, and that it was repaired by means of open reduction internal fixation. Tr. 937. Dr. Ogisu reviewed x-rays taken in October 2001 which revealed a "small ossicle at the radial margin of the first metacarpal." Id. Mr. Johnson stated that his left hand was "fine unless he attempts to perform heavy or prolonged gripping activities." Id. Dr. Ogisu observed that range of motion was decreased at the thumb. Id.

_____ Physical examination of Mr. Johnson by Dr. Ogisu revealed decreased cervical and lumbar lordosis, weight shifted onto the right leg, the left shoulder lower than the right, and the pelvis higher on the left, with a corresponding list in the spine. Tr. 938. Lumbar flexion, extension and lateral flexion bilaterally were full, but Mr. Johnson had lumbar discomfort with flexion. Id. Straight leg raising was negative to about 55 degrees bilaterally. Cervical flexion was full; extension was 30 degrees; lateral flexion was 25 degrees to the right and 33 to the left, rotation was 65 degrees to the right and 58 degrees to the left. Id.

Mr. Johnson was able to go from standing to sitting and vice versa, as well as from a sitting position to supine and vice versa, without difficulty. Id. Standing resulted in knee and low back discomfort, while sitting erect on the examination table

resulted in lumbar and left shoulder discomfort. Id.

Dr. Ogisu noticed that Mr. Johnson was able to reach, but with some discomfort when reaching overhead on the left. Id. Grip was strong on the right and mildly decreased on the left. Id. Manual dexterity was good, although a moderate decrease in left thumb active range of motion was noted. Id. There was focal tenderness proximal to the first metacarpophalangeal joint, but Dr. Ogisu noted "full range of motion including at the thumbs."[1] Id. Left shoulder range of motion was limited with regard to forward flexion (150 degrees) and abduction (140 degrees), both with pain. Id. Tenderness was found in the subacromial area and posteriorly over the shoulder. Id. Range of motion was full at the right shoulder, the elbows, the forearms, the wrists and the hands. Id. There was no atrophy in the upper extremities. Id. Upper extremity strength was full and symmetrical except for the left opponens pollicis.[2] Id.

Dr. Ogisu diagnosed low back pain, with relatively mild and nonspecific findings (Dr. Ogisu was unable to determine whether the observed decrease in left calf circumference and extensor hallucis longus strength was related to the lumbar condition or

_____

[1] Contradicting the statement on the same page of the report that "[r]ange of motion is decreased at the thumb." Tr. 937.

[2] The opponens pollicis is a muscle that winds around part of the first metacarpal bone of the hand. Wheeless' Textbook of Orthopedics, www.wheelessonline.com/ortho/opponens_pollicis.

14  - FINDINGS AND RECOMMENDATION

to knee surgeries); left hand fracture status post open reduction internal fixation, with decreased active thumb range of motion; and left shoulder impingement. Tr. 940.

Dr. Ogisu completed a Medical Source Statement of Ability to do Work-Related Activities. Tr. 941-944. In Dr. Ogisu's opinion, Mr. Johnson was able to lift 20 pounds occasionally and 10 pounds frequently; could stand or walk at least two hours out of an eight hour workday; could sit about six hours in an eight hour work day.[3] Dr. Ogisu opined that Mr. Johnson was limited to only occasional reaching and gross manipulation on the left. Tr. 941-43. Dr. Ogisu opined that Mr. Johnson's exposure to vibration and to hazards such as machinery and heights should be limited because "[h]e is unable to tolerate noise during his migraine/cluster headaches." Tr. 944.

3.   Mental impairments

On September 3, 1999, Mr. Johnson was evaluated by Frank Colistro, Ed.D. Tr. 461. At that time, Mr. Johnson identified substance abuse, primarily alcohol, as his main area of impairment. Id. Mr. Johnson related a history of substance abuse treatments followed by relapse in 1994, January 1999, and August 1999. Tr. 462.

///

------

[3] Under Social Security regulations, these findings constitute a conclusion that Mr. Johnson was able to engage in light work. See 20 C.F.R. § 404.1567(b).

15  - FINDINGS AND RECOMMENDATION

Dr. Colistro wrote that Mr. Johnson was alert and cooperative, but hygiene and grooming were "abysmal," and Mr. Johnson was "visibly agitated, and displays a mood which is markedly depressed." <u>Id.</u> Test results indicated substantial impairment across all areas of intellectual functioning, tr. 463, and substantial depression, anxiety, dependency, threat sensitivity and social withdrawal. Tr. 464. In Dr. Colistro's opinion, the impact of these impairments had resulted in moderate restriction of activities of daily living and marked difficulties in maintaining social functioning. <u>Id.</u>

Dr. Colistro diagnosed depression, recurrent and severe; polysubstance dependence/abuse, recently in remission; and personality disorder with dependent, inadequate and antisocial features. Dr. Colistro noted,

> The diagnostic profile for Mr. Johnson is complicated substantially by his admitted severe polysubstance dependence and abuse. It is reasonable to conclude that this condition, particularly the alcoholism dimension of it, has significantly exacerbated all aspects of his psychological dysfunction. Inasmuch as he has been sober for less than a month by his own report, it is too soon to say to what degree the residual affects [sic] of his alcoholism are impairing his daily functioning. Assuming for the sake of argument that all of his recitations today are honest and accurate, obtaining accurate diagnosis will be possible only after he has been clean and sober for at least six months and has been actively participating in a community-based mental health treatment program, which he clearly needs.

///

On July 17, 2000, Mr. Johnson was given a psychiatric evaluation by Lisa Sjodin, M.D. Tr. 441. Dr. Sjodin did not review Mr. Johnson's medical records, and Mr. Johnson was the sole informant for the evaluation. Id.

Mr. Johnson told Dr. Sjodin he was "not able to be around people," and reported intermittent depression over the past 10 years. Id. He reported an extensive alcohol and cocaine abuse history, having begun consuming alcohol at the age of 14. Id. Mr. Johnson said he was a daily drinker between 1987 and 1997, "with some periods of homelessness secondary to frequent unemployment." Id. He also reported using cocaine and crack cocaine "on and off" throughout that time. Id. He said he had been in and out of drug rehabilitation programs for the past three to four years. Id.

Mr. Johnson said he had been clean from all substances for the past year.[4] Tr. 442. He had been receiving treatment for depression with Zoloft. Although Mr. Johnson thought the Zoloft had improved his mood, he continued to feel hopeless about his future and he endorsed symptoms of anhedonia. He reported some paranoid ideation: "I always feel like people are talking about me." Id. Mr. Johnson denied previous psychiatric hospitalizations or suicide attempts. Id.

Mr. Johnson said he had been in a relationship with a woman

---

[4] Although Dr. Colistro had noted that Mr. Johnson related a substance abuse relapse in August 1999. Tr. 462.

17  - FINDINGS AND RECOMMENDATION

for the past eight years, with whom he had a 15-month-old daughter. Id. He was currently residing with his girlfriend and with his parents. Tr. 443.

Mr. Johnson denied full-time employment within the last 10-15 years. Id. He had been formally trained as a diesel mechanic in the military and worked full-time until 1987, but "he discontinued this because 'I got tired of it. More alcohol and drugs came into the picture.'" Id.

Mr. Johnson said he often visited his girlfriend and daughter. Tr. 444. He was able to shop for himself and bathed daily. He watched six to seven hours of TV daily if he had no appointments. He rode his bicycle for about 30 minutes a day and enjoyed taking care of his tomato plants in the garden. He grocery shopped with his girlfriend once a week and was able to do some housework such as mowing the lawn and general cleaning up. Tr. 444-45.

He stated that he went to church once in a while, but disliked attending AA meetings because there were too many people. He reported having one friend with whom he visited on the phone occasionally and socializing occasionally with the neighbors. Tr. 445.

Dr. Sjodin's diagnoses were possible substance-induced persisting dementia; history of ethanol and cocaine dependence in complete remission; major depressive disorder, mild to moderate;

personality disorder not otherwise specified (NOS) with avoidant and dependent features. Id. Dr. Sjodin thought Mr. Johnson most likely had a depressive disorder, but that his positive response to medication indicated that his symptoms of depression appeared to be "mild to moderate at this time." Id. However, Dr. Sjodin thought Mr. Johnson's poor concentration appeared to be associated with his depression. Tr. 446.

On September 1, 2000, Peter LeBray, Ph.D., reviewed Mr. Johnson's records on behalf of the Commissioner. Tr. 448-460. Dr. LeBray opined that Mr. Johnson was impaired by a depressive syndrome; a personality disorder evidenced by persistent disturbances of mood and pathological dependence, passivity or aggressivity; and a substance addiction disorder. Tr. 451, 453, 454. On the basis of these impairments, Dr. LeBray opined that Mr. Johnson had moderate difficulties in maintaining social functioning and often had deficiencies of concentration, persistence or pace resulting in failure to complete tasks in a timely manner, as well as one or two episodes of deterioration or decompensation in work settings. Tr. 455.

Dr. LeBray completed a Mental Residual Functioning Assessment indicating that in his opinion, Mr. Johnson was moderately limited in the ability to understand and remember detailed instructions, carry out detailed instructions, and maintain attention and concentration for extended periods. Tr.

457. Dr. LeBray thought Mr. Johnson also moderately limited in
the ability to interact appropriately with the general public and
get along with coworkers. Tr. 458. In handwritten comments, Dr.
LeBray noted:

> A. Can understand and remember simple instructions as
> well as work-like procedures and locations.
> B. Difficulty with concentration limits the client to
> routine tasks not requiring attention to detail. Can
> carry out simple instructions, tasks. Should have
> limited contact and interactions with others due to
> distractibility. No evidence of inability to complete
> a normal workday or work week or ability to maintain
> a schedule.
> C. Should have little or no direct public contact. No
> evidence of other restrictions.
> D. Needs predictable, routine activities,
> nonhazardous settings (relapse risk). Could benefit
> from assistance identifying attainable
> vocational/occupational goals.

Tr. 450.

On May 3, 2001, Mr. Johnson was given a psychological
examination by Gary Sacks, Ph.D. The evaluation consisted of a
diagnostic interview, mental status examination, and review of
Mr. Johnson's files. Tr. 1199. Mr. Johnson told Dr. Sacks that he
had worked sporadically as a laborer until one year previously,
or 2000, stopping because he couldn't be around other people. Tr.
1200. Mr. Johnson said he was able to work steadily for nine
years, between 1978 and 1987, but was fired for absenteeism
caused by alcohol and drug use. Id. Mr. Johnson had used alcohol
and drugs very heavily until approximately one year previously,

i.e., until 2000,[5] and Dr. Sacks concluded, "Alcohol and drugs appear to have played a significant role in causing his unsteady work history." Id.

Mr. Johnson said he currently lived with his parents, and had done so for the past nine years. Id. He reported having very few friends, but seeing his girlfriend of nine years three or four times a week. Id. Mr. Johnson stated that he had not been psychiatrically hospitalized, but that he saw a counselor. Dr. Sacks noted that Mr. Johnson did not appear to be involved in counseling "specific for a social anxiety disorder." Id.

Dr. Sacks diagnosed social anxiety disorder and polysubstance dependence in full and sustained remission by report. Tr. 1201. He concluded:

> Mr. Johnson suffered heavy alcohol and drug use for years from which he reportedly has been sober for one year. He continues to suffer moderately severe symptoms of social anxiety disorder which should respond to specific treatment. It is hoped that with treatment compliance, he can eventually return to work. Alcohol and drug use appeared a significant problem for him for many years. He is to be commended for his one year of sobriety.

Id.

On November 2001, Karen Bates-Smith, Ph.D., did another records review. Tr. 615-632. Dr. Bates found Mr. Johnson impaired by mild major depression, tr. 618, an anxiety disorder, social

---

[5] Despite telling Dr. Sjodin in July 2000 that he had been clean for a year. Tr. 442. As the ALJ noted in his decision, Mr. Johnson's sobriety date is "something of a moving target." Tr. 28.

phobia, tr. 620; a personality disorder, tr. 622; and polysubstance dependence, in remission. Tr. 623. Dr. Bates-Smith found that Mr. Johnson was moderately limited only in maintaining social functioning; she disagreed with Dr. LeBray's findings that Mr. Johnson had moderate difficulties in maintaining concentration, persistence, or pace. She rated his difficulties in maintaining concentration, persistence, or pace as "mild," and found no episodes of decompensation. Tr. 625. Like Dr. LeBray, Dr. Bates-Smith found that Mr. Johnson had moderate limitations in the ability to understand, remember and carry out detailed instructions, work in coordination with or proximity to others, and interact appropriately with the general public. Tr. 629-30. In her comments, Dr. Bates-Smith wrote:

> Claimant is able to understand, remember and carry out simple/repetitive instructions/tasks. Would have difficulty with detailed instructions/tasks. Claimant should not be expected to interact with the general public even on an occasional basis. Claimant should be capable of limited co-worker interactions within the work environment. May need assistance in setting long term goals.

Tr. 631.

On July 17, 2003, Mr. Johnson was evaluated by Juliana Ee, Ph.D. Mr. Johnson told Dr. Ee he hated being around people, feeling that they talked about him and judged him, and did not want him around. Tr. 1182. Mr. Johnson said he had been "down" for the past 10 to 15 years, feeling worthless, lacking energy,

finding it hard to concentrate, experiencing difficulty sleeping, and being irritable. Tr. 1183. Mr. Johnson denied suicidal ideation and reported no suicide attempts. Id. He reported no psychiatric hospitalizations, but said he had received inpatient treatment for substance dependence. Id. Current medical records indicated that he was being treated with Wellbutrin by Alan Yeo, M.D., in the Substance Abuse Treatment program, and that Dr. Yeo found Mr. Johnson to be "doing well, pretty stable and doing good, enjoys daughter, parents, girlfriend." Id. Dr. Ee noted that Dr. Yeo had diagnosed Mr. Johnson with alcohol dependence, in remission; cocaine dependence, in remission; chronic dysthymia; and anxiety disorder not otherwise specified. Tr. 1184.

Dr. Ee observed that Mr. Johnson was a poor historian, often vague about his complaints and personal information. Id. Although cooperative and pleasant, alert and oriented, his response to questions was slow and he had word-finding difficulties. Id. His mood appeared mildly dysphoric. Tr. 1185. Affect was appropriate and generally congruent with mood and ideation. Thought process was coherent and goal directed. Id. A mini-mental status exam indicated intact cognitive functioning and fair social judgment and capacity. He complained of memory difficulties. Id.

///

In  Dr.  Ee's  opinion,  Mr.  Johnson  met  the  diagnostic
criteria  for  dysthymic  disorder  and  his  reported  symptoms  were
consistent  with  his  previous  diagnosis  of  social  anxiety.  Id.
However,  in  Dr.  Ee's  opinion,  "the  veteran's  social  anxiety  with
associated  dysthymic  disorder  does  not  make  him  unemployable.
From a mental health perspective, his psychiatric difficulties do
not  preclude  him  from  engaging  in  gainful  employment"  Id.  Dr. Ee
opined that Mr. Johnson's psychiatric difficulties were treatable
with  a  combination  of  medication  and  social  skills  training.  Id.

**Hearing Testimony**

1.    <u>Hearing testimony in 2002</u>

Mr.  Johnson  testified  at  the  hearing  that  he  is  unable  to
use  his  arms  and  hands  repetitively  or  for  more  than  10  or  15
minutes  at  a  time  because  of  pain  in  his  left  shoulder,  left
thumb and right elbow. Tr. 1364, 1409, 1413, 1414.

Mr.  Johnson  said  he  still  has  headaches,  and  that  he
usually  takes  oxycodone  or  Vicodin,  which  ease  the  pain,  but
don't take the pain completely away. Tr. 1359. Mr. Johnson said
that "every couple of years," he has headaches every day for up
to  two  or  three  weeks.  Id.  Otherwise,  he  still  gets  headaches
once or twice a week. Tr. 1360.

Mr.  Johnson  testified  that  he  currently  lives  with  his
parents. Tr. 1371. He had cared for his three-year-old daughter
two or three hours a day while her mother was at work, but this

ended three or four months before the hearing. Tr. 1371-72.

When asked about his daily activities, Mr. Johnson testified that he tried bowling one day, but it hurt his knee too much. Tr. 1379. Mr. Johnson said he has difficulty concentrating so does not do much reading. Id.

2.    Hearing testimony in 2004

Mr. Johnson testified that he still has headaches about once a week, but that Zomig stops them within 30 to 45 minutes. Tr. 1404. Mr. Johnson said that when he feels a headache coming on, he waits 15 to 20 to see whether it will go away, and then, if it does not, he takes the Zomig. Tr. 1405. He usually falls asleep after the headache, either from the headache itself or from the medication. Tr. 1406. He said it is usually about two hours before he is able to resume whatever he was doing before the headache occurred. Tr. 1407.

Mr. Johnson testified that his left shoulder "tightens up and ... gets in knots and I'm not able to do nothing with this whole arm or anything... And it seems like the more I use it, the worse it gets." Tr. 1409. Mr. Johnson said his doctors do not know the cause of this symptom, but that it flares up when he does a lot of lifting or overhead work. Tr. 1409-10.

Mr. Johnson said that although he is not receiving treatment for it, his right elbow bothers him if he does a lot of repetitive lifting, picking things up and putting them down. Tr.

1414. Mr. Johnson said that because of the pain in his shoulder, he is required to sit and stand at 30-minute intervals. Tr. 1415. This is because he has to do certain things to get his shoulder to stretch out, such as "walk it up a wall," or "lean over and do circular motions ... in order to get blood flowing." Tr. 1416. Mr. Johnson said he is not able to get up and down without holding on to something. Id.

For the past two to three years, Mr. Johnson has received a non-service connected VA pension in the amount of $1,097 per month. He lives with his parents, but has no housekeeping duties except washing his own clothes. Tr. 1431. He does not prepare his own meals. Id.

The 2004 hearing was continued to October 20, 2004 to take testimony from Richard Ross, a vocational expert (VE). At this hearing, the ALJ asked Mr. Ross to consider a hypothetical individual of Mr. Johnson's age, education and prior work experience, capable of light level work, able to stand at least two hours and sit at least six hours in an eight-hour workday, able to lift 20 pounds occasionally and 10 pounds frequently, but avoiding forceful or prolonged gripping with the right hand, and with restrictions on climbing, balancing, kneeling, crouching, stooping and crawling. Tr. 1444-45. In the VE's opinion, such an individual could work as a cannery worker and small parts assembler. Tr. 1447.

When the ALJ added a requirement of simple, routine, repetitive work with minimum public contact, the VE opined that such an individual could still work in a cannery and in about 50% of the available jobs for a small parts assembler. Tr. 1447-48. The VE's opinion was not changed by the additional restriction of avoiding forceful and repetitive activity with the upper extremities. Tr. 1448.

When the ALJ asked the VE to consider an individual who was required to be absent from the workplace at unpredictable times three or more hours per week, the VE responded that such an individual could not sustain employment in the occupations named by the VE. Tr. 1449. Asked by Mr. Johnson's attorney to consider an individual who was required to avoid repetitive activity in the upper extremities, or in only the left upper extremity, the VE opined that such a person would be excluded from all the occupations he had named. Tr. 1449.

### ALJ's Decision

The ALJ found that Mr. Johnson's osteoarthritis of the knees, depressive disorder, borderline intellectual functioning, personality disorder, social phobia, and substance abuse disorder were severe impairments. Tr. 22, 32. However, the ALJ concluded that "[O]ther symptoms and complaints appear in the record from time to time, but there is nothing to show that they are more than transient or cause significant vocational limitations." Tr.

22.[6] The ALJ noted that Mr. Johnson alleged having had migraines for many years, even during the time he was actively employed, and that they did not "particularly interfere" with his work in the past. Tr. 27. The ALJ also found that the headaches were responding to Zomig, although 45 minutes were required for it to take effect. Id.

The ALJ found Mr. Johnson's testimony not credible because Mr. Johnson had been "able to maintain daily living activities such as bike riding and bowling."[7] The ALJ cited an intake form from the VA signed by Nancy Wagoner and containing what appear to be responses by Mr. Johnson to a set of questions, dated October 23, 2000. Tr. 477. The ALJ also wrote,

> The claimant reported that he used public transportation and went for walks, and that he needed to rest from activities every 2-3 hours (Exhibit 10E), a level of functioning corroborated by his girlfriend (Exhibit 9E). These activities would be reasonable within generally scheduled work breaks.

Tr. 27-28. Another explanation for the ALJ's finding that Mr. Johnson was not credible was:

///

---

[6] Mr. Johnson challenges the ALJ's finding that other impairments, not specified by the ALJ, are not severe, asserting that his headaches, medication side effects, chronic lumbar strain, and upper extremity impairments are also severe enough to survive elimination at step two of the analysis.

[7] The ALJ's finding that Mr. Johnson was able to bowl is based on Mr. Johnson's statement in 2000 to Nancy Wagoner that he did so, tr. 477, but Mr. Johnson testified at the 2002 hearing that he is no longer able to bowl because of pain in his knees. Tr. 1379.

The testimony and records show that the claimant
helped paint his dad's house, where he was living,
and he also did some auto mechanic's work for others.
He has continued to perform some odd jobs (Exhibit
16F/7).[8] When his girlfriend (the mother of his
child) worked, the claimant took care of his young
daughter during the day. Caring for a young child can
be physically and mentally demanding, yet the
claimant apparently did so without particular
difficulty. All these activities suggest that the
claimant is more capable than he has alleged. He also
related at the supplemental hearing that he now gets
$1,097 from the VA and this is more than he earned
before his drug and alcohol abuse took hold in 1988.
Curiously, he reported that he pays his parents all
of $100.00 for room and board, when he reported at
the first hearing that he paid them $140.00 and that
was when he received $300 less from the VA. He
obviously is making more money on VA disability and
has reduced living expenses by living with his
parents and appears to have little motivation to
return to work.

Tr. 28.

The ALJ adopted the findings of Dr. Ogisu with respect to

Mr. Johnson's musculoskeletal physical limitations. Tr. 29. The

ALJ accepted the opinions of Dr. LeBray and Dr. Bates-Smith,

finding that Mr. Johnson could manage simple, predictable,

routine instructions and tasks in non-hazardous settings, with

limited contact and interaction with the public and others. Tr.

29.

///

///

--------

[8] Exhibit 16F/7 is a page of mental health treatment notes
taken by Rick Stanek. There is no mention of Mr. Johnson's doing
odd jobs. Nor is there any reference to painting his father's house
or doing auto mechanics for others.

29  - FINDINGS AND RECOMMENDATION

**Standards**

The court must affirm the Commissioner's decision if it is based on proper legal standards and the findings are supported by substantial evidence in the record. <u>Meanel v. Apfel</u>, 172 F.3d 1111, 1113 (9th Cir. 1999). Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971); <u>Andrews v. Shalala</u>, 53 F.3d 1035, 1039 (9th Cir. 1995). In determining whether the Commissioner's findings are supported by substantial evidence, the court must review the administrative record as a whole, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion. <u>Reddick v. Chater</u>, 157 F.3d 715, 720 (9th Cir. 1998). However, the Commissioner's decision must be upheld even if "the evidence is susceptible to more than one rational interpretation." <u>Andrews</u>, 53 F.3d at 1039-40.

The initial burden of proving disability rests on the claimant. <u>Meanel</u>, 172 F.3d at 1113; <u>Johnson v. Shalala</u>, 60 F.3d 1428, 1432 (9th Cir. 1995). To meet this burden, the claimant must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which ... has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. § 423(d)(1)(A).

A physical or mental impairment is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3). This means an impairment must be medically determinable before it is considered disabling.

The Commissioner has established a five-step sequential process for determining whether a person is disabled. Bowen v. Yuckert, 482 U.S. 137, 140 (1987); 20 C.F.R. §§ 404.1520, 416.920.

In step one, the Commissioner determines whether the claimant has engaged in any substantial gainful activity. 20 C.F.R. §§ 404.1520(b), 416.920(b). If not, the Commissioner goes to step two, to determine whether the claimant has a "medically severe impairment or combination of impairments." Yuckert, 482 U.S. at 140-41; 20 C.F.R. §§ 404.1520(c), 416.920(c). That determination is governed by the "severity regulation," which provides:

> If you do not have any impairment or combination of impairments which significantly limits your physical or mental ability to do basic work activities, we will find that you do not have a severe impairment and are, therefore, not disabled. We will not consider your age, education, and work experience.

§§ 404.1520(c), 416.920(c). If the claimant does not have a severe impairment or combination of impairments, the disability

claim is denied. If the impairment is severe, the evaluation proceeds to the third step. Yuckert, 482 U.S. at 141.

In step three, the Commissioner determines whether the impairment meets or equals "one of a number of listed impairments that the [Commissioner] acknowledges are so severe as to preclude substantial gainful activity." Yuckert, 482 U.S. at 140-41. If a claimant's impairment meets or equals one of the listed impairments, he is considered disabled without consideration of her age, education or work experience. 20 C.F.R. s 404.1520(d), 416.920(d).

If the impairment is considered severe, but does not meet or equal a listed impairment, the Commissioner considers, at step four, whether the claimant can still perform "past relevant work." 20 C.F.R. §§ 404.1520(e), 416.920(e). If the claimant can do so, he is not considered disabled. Yuckert, 482 U.S. at 141-42. If the claimant shows an inability to perform his past work, the burden shifts to the Commissioner to show, in step five, that the claimant has the residual functional capacity to do other work in consideration of the claimant's age, education and past work experience. Yuckert, 482 U.S. at 141-42; 20 C.F.R. §§ 404.1520(f), 416.920(f).

## Discussion

Mr. Johnson asserts that the ALJ erred by 1) failing to consider his headaches and his musculoskeletal problems in

determining his RFC; 2) improperly rejecting Dr. Ogisu's opinion that he was limited to "occasional" handling/gross manipulation and reaching with the left hand, and that he was unable to tolerate noise during headaches; 3) improperly rejecting the opinion of reviewing psychologist LeBray that Mr. Johnson would "often" have deficiencies of concentration, persistence or pace, resulting in failure to complete tasks in a timely manner; 4) improperly rejecting the opinion of physician's assistant Kelley, adopted by Dr. Matson, that Mr. Johnson was limited to sedentary work and that he had a moderate lack of fine motor coordination of the left thumb and limitations on repetitive movement resulting from all three upper extremity impairments; 5) improperly rejecting Mr. Johnson's testimony; and 6) improperly rejecting testimony by a third party.

1.    Headaches

Mr. Johnson argues that his headaches are severe impairments which the ALJ failed to consider in assessing his RFC. He relies primarily on the medical evidence from 1999 to April 2003, which shows severe headaches occurring several times a week, accompanied by photophobia and noise sensitivity.[9]

---

[9] While the medical records from 1999 to April 2003 do contain significant evidence of severe, frequent headaches for which Verapamil, Imitrex, oxycodone, and Vicodin gave only temporary relief, the medical records also contain evidence that during this same period of time, Mr. Johnson reported his headaches sometimes went away for years at a time (see, e.g., tr. 1201-02 (Mr. Johnson's statement in May 2001 that he "rarely gets headaches,"

But Mr. Johnson acknowledges that the most recent medical evidence, from May 2004, indicates that Zomig was effective in preventing the headaches within about 30-45 minutes. Mr. Johnson's testimony at the August 2004 hearing was that he has headaches about once a week, but that Zomig stops them within 30-45 minutes. The ALJ made a finding, consistent with this evidence, that Mr. Johnson's headaches responded to Zomig within about 45 minutes.

I find no error in the ALJ's conclusion that headaches occurring approximately once a week and stopped by medication within 45 minutes do not constitute a severe impairment. Substantial evidence supports the ALJ's conclusion that Mr. Johnson's headaches are currently limited to about 45 minutes a week. Accordingly, I find no error in the ALJ's failure to incorporate into the vocational assessment Dr. Ogisu's May 2004 opinion that Mr. Johnson would be unable to tolerate noise during a headache, since a headache would occur only about once a week and would, by Mr. Johnson's testimony, be resolved within 45 minutes of taking Zomig.

///

///

---

and that the headaches "may come in clusters for two to three weeks, and then may go away for as long as a year or two") and that they were not always severe or long-lasting (see, e.g., tr. 757 (June 2002 report from Mr. Johnson of two recent migraines that "were mild and resolved quickly").

34   - FINDINGS AND RECOMMENDATION

2.   <u>Musculoskeletal complaints</u>

      a.   <u>Inclusion of upper extremity impairments in RFC</u>
           <u>analysis</u>

Mr. Johnson argues that the ALJ erred in failing to include upper extremity impairments in his RFC analysis. These alleged impairments are chronic trapezial strain affecting the left shoulder, residuals from the old fracture of the left thumb, and medial epicondylitis of the right elbow, all of which he asserts are "reported to flare with any kind of repetitive use or movement." Plaintiff's Opening Brief, p. 8. Mr. Johnson also argues that the reduced range of motion in the left thumb leads to some degree of incoordination, a moderate impairment of fine motor activity, and reduced grip strength during flare-ups.

      1) <u>Left shoulder</u>

The claimant has the burden of demonstrating the existence of an impairment that "results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3). There is no medical evidence that establishes an abnormality of the left shoulder. In July 2003, Mr. Kelley found that Mr. Johnson had a normal AC joint and intact clavicle. Tr. 1192. An x-ray of the shoulder was normal. Tr. 1189. On July 10, 2003, Dr. Johnson found full range of motion and no changes in muscle bulk or tone. Tr. 1186. In his comprehensive orthopedic

examination of May 2004, Dr. Ogisu noted no physical findings with respect to the left shoulder and made no diagnosis. Tr. 939. Dr. Ogisu found that upper extremity strength was full and symmetrical except for the left opponens pollicis in the hand.

I find no error in the ALJ's omission of the left shoulder as a severe impairment.[10]

2) Right elbow

Nor are there any clinical findings to support an impairment in Mr. Johnson's right elbow. Although on July 9, 2003, Mr. Kelley diagnosed medial epicondylitis of the right elbow,[11] the next day, July 10, 2003, Dr. Johnson found that the right elbow had full range of movement, no crepitus, and normal anatomy. Tr. 1188. In May 2004, Dr. Ogisu found full range of motion in the elbows, forearms and wrists, and full and symmetrical upper extremity strength except in the hand. Id.

---

[10] I note that although the ALJ did not find a severe impairment of the left shoulder, the VE was asked to consider an individual who was limited in his ability to reach overhead on the left. This indicates that the ALJ did incorporate into his RFC assessment Mr. Johnson's testimony that prolonged overhead reaching was painful to his left shoulder.

[11] This diagnosis is unsupported by any physical findings or clinical evidence. The only medical evidence pertaining to the right elbow dates back almost 30 years: on July 10, 2003, Dr. Johnson recorded that Mr. Johnson first complained of right elbow pain in February 1976, with "serially normal exams," and that in April 1976, an orthopedic surgeon diagnosed him with a "covert sprained elbow" and prescribed a light arm cast. Tr. 1189. Dr. Johnson wrote, "The patient continued to have complaints documented through September 1976." Id.

Absent any medically determined abnormality of the right elbow, I find no error in the ALJ's omission of the right elbow as constituting a severe impairment.

3) <u>Left thumb</u>

Although the evidence shows that Mr. Johnson sustained a fracture of the left thumb in the 1980s, the clinical findings by Mr. Kelley on July 9, 2003 show that Mr. Johnson was able to approximate his left thumb to within two centimeters of the median crease and had grip strength of 5/5. Tr. 1192. On July 10, 2003, Dr. Johnson noted full strength in the left hand except that the left thumb was 4/5; coordination was normal, as was sensory examination. Tr. 1188. Anatomy of the left thumb was normal, without atrophy. <u>Id.</u>

In May 2004, Dr. Ogisu made inconsistent findings about range of motion of the left thumb, finding in a single report both that range of motion was decreased at the thumb and that Mr. Johnson had full range of motion, including at the thumbs. Tr. 937. Dr. Ogisu found full range of motion in the forearms, wrists and hands. Tr. 939. Dr. Ogisu opined that manual dexterity was good, and that grip was only mildly decreased on the left. Tr. 939.

These findings would not support a conclusion that Mr. Johnson had a severe impairment arising from the fracture of his left thumb in the 1980s. I therefore find no error in the ALJ's

conclusion that the healed fracture of the left thumb did not constitute a severe impairment.

    4) <u>Lumbar strain</u>

Mr. Johnson argues that the ALJ erred in failing to find that lumbar strain was a severe impairment. Specifically, Mr. Johnson argues that the ALJ should have incorporated into his RFC analysis Mr. Kelley's 2003 notation that Mr. Johnson reported reduced range of motion, motor loss, muscle spasm, and limp during flare-ups.

In July 2003, Mr. Kelley wrote that Mr. Johnson had low back pain without a specific injury, tr. 1191, with pain flare-ups one to two times a month. <u>Id.</u> During flare-ups, Mr. Kelley wrote, there was "additional motion loss, muscular spasm, and limping." Tr. 1192.[12]  However, x-rays taken in 2003 showed only mild degenerative joint disease in the lumbar spine. Tr. 1188. Mr. Kelley's report of July 2003 shows a diagnosis of chronic lumbosacral strain superimposed on mild degenerative disease. Tr. 1193. Dr. Ogisu's diagnosis was low back pain, with relatively mild and nonspecific findings. Tr. 940. Dr. Ogisu noted in his examination of 2004 that Mr. Johnson was able to go from standing

---

[12] This notation is based solely on Mr. Johnson's report to Mr. Kelley. Tr. 1191. The reference to "additional" motion loss, muscle spasm and limping apparently refers to Mr. Johnson's well-documented impairments in both knees. The knee impairments are not discussed here because Mr. Johnson has not challenged the Commissioner's findings with respect to his knees.

to sitting and vice versa, as well as from a sitting position to supine and vice versa without difficulty. In Dr. Ogisu's opinion, Mr. Johnson was able to stand or walk at least two hours out of an eight hour workday and could sit about six hours in an eight hour work day. Tr. 942.

I conclude that substantial evidence supports the ALJ's conclusion that Mr. Johnson's lumbar symptoms did not constitute a severe impairment.

> b.    Dr. Ogisu's statement that Mr. Johnson was limited to "occasional" reaching and gross manipulation with the left hand

Mr. Johnson argues that the ALJ should have included in his residual functional assessment the statement by Dr. Ogisu that reaching and gross manipulation were limited to "occasionally" with the left hand. The ALJ did ask the VE to consider an individual who was required to avoid forceful or prolonged gripping with the left hand, but he did not include in his hypothetical to the VE a limit on reaching or gross manipulation with the left hand.

While the ALJ may not reject "significant probative evidence" without explanation, see, e.g., Flores v. Shalala, 49 F.3d 562, 571 (9th Cir. 1995), I find no error in the ALJ's failure to incorporate this particular opinion into his findings. A physician's statements must be read in context. Holohan v. Massinari, 246 F.3d 1195, 1205 (9th Cir. 2001). Dr. Ogisu's

report, taken as a whole, does not support a limitation on reaching with the left hand, because Dr. Ogisu found full range of motion in the hands, wrists and forearms, good manual dexterity, and full or only slightly decreased grip strength.

Nor does Dr. Ogisu's report, taken as a whole, support a limitation on gross manipulation with the left hand. Dr. Ogisu opined in his report that Mr. Johnson's manual dexterity was good, that he had full strength in his left hand except for a mild decrease at the left thumb, that the forearms, wrists and hands had full range of motion, and that coordination and sensory findings for the upper extremities were normal.[13] In view of this evidence, I find no error in the ALJ's failure to accept a single finding by Dr. Ogisu that Mr. Johnson was limited in reaching and gross manipulation with the left hand.

     c.   <u>ALJ's failure to adopt Mr. Kelley's opinion that Mr. Johnson was limited to sedentary work</u>

Mr. Johnson contends that the ALJ erred when he specifically rejected Mr. Kelley's opinion that Mr. Johnson was limited to sedentary work. In July 2003, Mr. Kelley wrote:

///

---

[13] The earlier findings of Mr. Kelley and Dr. Johnson also contradict this particular statement by Dr. Ogisu. Mr. Kelley observed that Mr. Johnson was able to approximate his thumb to within two centimeters of the median crease, and that grip was 5/5 in the left hand. Dr. Johnson found full strength in the hands except for the left thumb, normal coordination and normal sensory examination.

> In terms of employability, this patient has been a
> diesel mechanic in the past. His overall functional
> impairment would have a significant impact on manual
> labor such as doing the type of usual and customary
> work that he does. He would only be fit for sedentary
> work at this time.

Tr. 1193. The ALJ considered this evidence, but instead adopted
the opinions of Dr. Ogisu, as expressed in the Medical Source
Statement of Ability to do Work-Related Activities, that Mr.
Johnson was capable of the exertional demands of light work. Mr.
Johnson argues that the ALJ's reason for rejecting Mr. Kelley's
opinion--that Dr. Ogisu disagreed with it--was "not a reason at
all." Mr. Johnson argues that the ALJ's real reason consisted
"strictly of a comparison of credentials (Certified Physician's
Assistant vs. M.D.), ignoring the fact that this Physician's
Assistant report was specifically approved by an M.D."
Plaintiff's Opening Brief, p. 10. I am unpersuaded by this
argument because I am unconvinced that the administrative record
demonstrates that Mr. Kelley's opinions were those of an
"acceptable medical source."

Under the Social Security regulations governing medical
opinions, "acceptable medical sources" specifically include
licensed physicians and licensed psychologists, but not nurse
practitioners. The opinion of a treating nurse practitioner may
be treated as part of a physician's opinion only if the nurse
practitioner works closely under the supervision of a treating

physician. A nurse practitioner working on his or her own does not constitute an acceptable medical source. <u>Gomez v. Chater</u>, 74 F.3d 967 (9th Cir. 1996).

While Mr. Kelley's reports carry the notation that they have been "approved by" Dr. Matson, the record shows "approved by" notations from Dr. Matson on the psychological evaluation conducted by Dr. Sacks on May 3, 2001, the psychological examination conducted by Dr. Ee on July 17, 2003, an eye examination provided by William Parr, M.D. on July 9, 2003, the medical examination conducted by Dr. Siegal on May 3, 2001, and the orthopedic examination conducted by Dr. Johnson on July 10, 2003. Tr. 1182, 1186, 1194, 1198, 1201. There is no indication in the record that Dr. Matson is Mr. Johnson's treating physician.

The omnipresence of Dr. Matson in the VA medical reports furnished by medical doctors and psychologists, as well as Mr. Kelley, suggests that the words "approved by" cannot reasonably be construed to mean that Dr. Matson worked in tandem with, or closely supervised, all the practitioners who provided reports. The notation that Mr. Kelley's report was "approved by" Dr. Matson does not, in these circumstances, demonstrate that Mr. Kelley worked with or under the close supervision of Dr. Matson. In the absence of such evidence, the ALJ properly disregarded Mr. Kelley's opinion because it is not an opinion from a medically acceptable source. I note further that Mr. Kelley's opinion that

Mr. Johnson was limited to sedentary work does not appear in any of the other reports approved by Dr. Matson that originated with acceptable medical sources such as physicians and psychologists.

I find no error in the ALJ's rejection of Mr. Kelley's opinion that Mr. Johnson was fit only for sedentary work.

> d. <u>ALJ's rejection of Dr. LeBray's opinion that Mr. Johnson would "often" have deficiencies of concentration, persistence, or pace without explanation</u>

Mr. Johnson argues that the ALJ failed to consider the finding by Dr. LeBray that he would "often" have deficiencies of concentration, persistence, or pace. Tr. 455. A finding that a claimant would "often" experience deficiencies of concentration, persistence or pace is defined as a "moderate" limitation under Social Security regulations and is not considered to preclude work, even though it represents a severe limitation. 20 C.F.R. § 404.1520a(d)(1). Nevertheless, Mr. Johnson argues that inclusion of this impairment in the hypothetical question to the VE would, by the VE's testimony, have resulted in precluding Mr. Johnson from retaining the jobs identified.

My review of the record shows no evidence that the VE said an individual who often had deficiencies of concentration, persistence or pace would not be able to perform the jobs identified. In fact, the VE testified that a person who had "moderate" difficulty with concentration, persistence and pace--

synonymous with "often"--*would* be able to perform the identified jobs because "these are unskilled jobs, and again, part of the definition of an unskilled job is it requires little capacity for concentration." Tr. 1458.

Mr. Johnson's attorney asked the VE whether a person with a "<u>marked</u> concentration difficulty" would be able to perform the identified jobs. Tr. 1459. The VE responded, "[P]robably not." <u>Id.</u> This testimony is not helpful to Mr. Johnson because in this context, "marked" concentration difficulty is a more severe category than the "moderate" that is synonymous with the "often" found by Dr. LeBray. See tr. 455. No mental health practitioner who evaluated Mr. Johnson or reviewed his records found that Mr. Johnson had "marked" difficulties with concentration. See, e.g., tr. 625 (Dr. Bates-Smith's opinion that Mr. Johnson had "mild" limitations in maintaining concentration, persistence, or pace); tr. 1185 (Dr. Ee's opinion in July 2003 that Mr. Johnson's psychiatric difficulties did not preclude gainful employment).

The VE testified that a person with moderate limitations in the areas of concentration, persistence and pace would be able to perform the unskilled jobs identified. The VE's testimony was consistent with the ALJ's RFC findings. I find no error.

3.    <u>Rejection of Mr. Johnson's testimony</u>

Mr. Johnson argues that the ALJ erred in failing to accept Mr. Johnson's testimony that he was unable to use his upper

extremities repetitively or for more than 10-15 minutes at a time because of the pain it caused in his left shoulder, left thumb, and right elbow. However, as discussed above, there is no medical evidence of underlying impairments of the shoulder, elbow and thumb that could cause such complaints. A claimant's testimony about pain may be disregarded if it is unsupported by medical evidence which supports the *existence* of such pain, although the claimant need not submit medical evidence which supports the *degree* of pain. <u>Bunnell v. Sullivan</u>, 947 F.2d 341, 347 (9th Cir. 1991)(en banc).

Mr. Johnson argues that the ALJ erred in failing to accept his testimony that his headaches render him nonfunctional twice a week for two hours at a time because he is required to lie down, stay in a dark, quiet room, and take "powerful medication that significantly reduces his concentration or puts him to sleep." Plaintiff's Opening Brief, p. 11. While this argument may characterize Mr. Johnson's testimony at the July 2002 hearing, the testimony at the 2004 hearing was significantly different.

At the 2004 hearing, Mr. Johnson testified that his headaches occurred about once a week, tr. 1404. He stated further that when he felt a headache coming on, he usually waited 15 to 20 minutes before taking anything, because sometimes the headaches stopped without medication. Tr. 1405. While he waited, he tried to go to a quiet place so that he could try to avoid the

headache by relaxing. Tr. 1406. If the headache came on anyway, he took Zomig, which stopped the headaches in "30, 45 minutes or so." Id. Mr. Johnson also said he "usually" falls asleep "after having one of these episodes." Tr. 1406. There was no testimony at the later hearing that the severe headaches occurred once or twice a week, or Mr. Johnson was required to lie down in a dark, quiet room, or that the Zomig significantly reduced his concentration or put him to sleep. I find no error in the ALJ's failure to credit Mr. Johnson's 2002 testimony, when the 2004 testimony, reflecting the use of an effective headache treatment, was quite different.

Mr. Johnson also argues that the ALJ erred in failing to accept his testimony about episodes of intense depression and irritability rendering him unable to get out of bed, leave home, or tolerate anyone's presence. The ALJ found that "[t]he record suggests that the claimant has difficulty dealing with groups, a situation that is considered in evaluating his ability to work." Tr. 26. The ALJ also found that Mr. Johnson's ability to use public transportation, go for walks, care for his daughter, and shop for himself suggested that Mr. Johnson was more capable than he alleged.[14]

_____

[14] As noted, the ALJ's citation to Exhibit 16F/7 as support for his finding that Mr. Johnson helped paint his father's house, did auto mechanic's work for others, and performed some odd jobs is erroneous. In the absence of an accurate citation to the record, I therefore disregard those findings.

Dr. Colistro, in 1999, was the only mental health practitioner to diagnose severe depression. However, Dr. Colistro specifically stated that

> "[t]he diagnostic profile for Mr. Johnson is complicated substantially by his admitted severe polysubstance dependence and abuse. It is reasonable to conclude that this condition, particularly the alcoholism dimension of it, has significantly exacerbated all aspects of his psychological dysfunction. Inasmuch as he has been sober for less than a month by his own report, it is too soon to say to what degree the residual affects [sic] of his alcoholism are impairing his daily functioning. ... [O]btaining accurate diagnosis will be possible only after he has been clean and sober for at least six months. ...

After Mr. Johnson had been clean and sober for more than six months, there is no clinical evidence of severe depression or irritability. See, e.g., tr. 1384 (testimony of psychological expert Dr. Nance at 2002 hearing that if alcohol and illicit drug use were factored out, he would place Mr. Johnson's restrictions on social functioning in the mild category and his difficulty in maintaining concentration, persistence, and pace in the moderate category); tr. 441-446 (Dr. Sjodin's diagnosiss of "mild to moderate" major depressive disorder); tr. 448-456 (records review by Dr. LeBray on September 1, 2000 concluding that Mr. Johnson's mental impairments consisted of depressive syndrome, personality disorder and mood disorder, causing moderate difficulty in maintaining social functioning and moderate limitations on the

ability to get along with co-workers and the ability to interact appropriately with the general public); tr. 1199 (no diagnosis of depression or dysthymic disorder by Dr. Sacks); tr. 618 (finding by Dr. Bates-Smith that Mr. Johnson had "mild major depression"); tr. 1184 (Dr. Ee's diagnosis of chronic dysthymia).

Mr. Johnson has denied psychiatric hospitalizations except for drug and alcohol treatment, tr. 442, 1200, and suicidal ideation or attempts. Tr. 442, 1183.

I conclude that substantial evidence in the record supports the ALJ's finding that because Mr. Johnson was able to socialize with his family, girlfriend, and others, care for his daughter, shop for himself, and do odd jobs for others, his testimony about limitations caused by depression was not entirely credible.

Mr. Johnson testified that he lives with his parents and that he cared for his small daughter several hours a day for three or four months. Tr. 1371-72. Mr. Johnson told Dr. Sjodin that he lived part of the time with his girlfriend and daughter, tr. 443, and told Dr. Sacks that he saw Ms. Tillman three or four times a week. Tr. 1200. Ms. Tillman has stated that Mr. Johnson visits other people about twice a week, calls his daughter on the telephone once a week, sees family members every day, goes to the grocery store once a week, and travels on the bus. Tr.123-134. Mr. Johnson told Dr. Sjodin in 2000 that he occasionally attended church, socialized occasionally with neighbors, shopped for

himself, and visited on the telephone with a friend. Tr. 444-45.

In the absence of clinical evidence that Mr. Johnson suffers from severe depression, and many statements from Mr. Johnson and his girlfriend which contradict Mr. Johnson's claim that he is unable to get out of bed, leave the house, or tolerate anyone else's presence, the ALJ's reasons for rejecting this testimony are supported by substantial evidence in the record, and were not erroneous.

4.    Rejection of statement by lay witness

On February 26, 2001, Ms. Tillman completed a Third Party Information on Activities of Daily Living and Socialization. Tr. 123-134. Ms. Tillman said she sees Mr. Johnson two to three times a week. She states that he visits with other people about twice a week, but "likes to stay to himself," and does not have many friends. Tr. 125. According to Ms. Tillman, Mr. Johnson has problems relating to store clerks and neighbors, but that he is able to prepare meals several times a day for himself and others, tr. 129, and calls his daughter on the telephone once a week. Tr. 131. She states that he handles money responsibly, paying his bills on time and making his own purchases. Tr. 132. In response to a question about his ability to get along with co-workers, she wrote, "He has bad attitude, no respect." Tr. 133.

The ALJ stated in his decision that he had considered Ms. Tillman's statement. Tr. 28. The ALJ said,

> She noted his difficulty with socialization, and her
> reports are considered credible to the extent that
> they are consistent with the medical reports and
> other evidence reviewed above.

Id. Mr. Johnson argues that the ALJ implicitly rejected several of Ms. Tillman's statements by making contrary findings, such as that Mr. Johnson had "moderate" difficulty with social interaction. Mr. Johnson argues that Ms. Tillman's observations indicate a "marked" difficulty with social interaction and "intolerance for daily contact with anyone." Plaintiff's Opening Brief, p. 16.

I disagree with Mr. Johnson's assertions. I find no indication in Ms. Tillman's statement of "marked" difficulty with social interaction--she states that Mr. Johnson sees friends twice a week, talks to his daughter on the telephone once a week,[15] lives with his father, and prepares meals for others. Nor do I find any indication in Ms. Tillman's statement that Mr. Johnson has an intolerance for daily contact with anyone. Besides the responses discussed above, she has also noted that Mr. Johnson sees family members every day, tr. 123, starts conversations with family members, id., has appropriate conversations, tr. 124, goes to the grocery store once a week,

---

[15] The ALJ also noted in his decision that Mr. Johnson had spent a period of time caring for his daughter. Tr. 28. Mr. Johnson testified at the 2002 hearing that he cared for his daughter when she was three years old, two or three hours a day while her mother was at work.

id., and travels on the bus, tr. 126. I find no inconsistency between Ms. Tillman's observations and Dr. LeBray's findings.

### Conclusion

I conclude that the Commissioner's decision is free of legal error and based on substantial evidence in the record as a whole. I recommend that the Commissioner's decision be affirmed.

### Scheduling Order

The above Findings and Recommendation will be referred to a United States District Judge for review. Objections, if any, are due February 16, 2007. If no objections are filed, review of the Findings and Recommendation will go under advisement on that date. If objections are filed, a response to the objections is due March 2, 2007, and the review of the Findings and Recommendation will go under advisement on that date.

Dated this 1st day of February, 2007.

/s/   Dennis James Hubel
        Dennis James Hubel
    United States Magistrate Judge